## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| MATTHEW R. DAVIS | ) | No. |
| | ) | |
| v. | ) | |
| | ) | |
| STATE OF MAINE | ) | |

### PETITION FOR HABEAS RELIEF UNDER 28 U.S.C. § 2254

The Petition, Matthew R. Davis submits the following petition for habeas relief based on a violation of his Sixth Amendment rights to effective assistance of counsel.

### I.    PROCEDURAL HISTORY.

1.    Matthew Davis was charged with ten counts of for a total of ten charges-two counts of intentional or knowing murder, 17-A M.R.S. § 201(1)(A) (2017); four counts of arson (Class A), 17-A M.R.S. § 802(1)(A) (2017); one count of theft (Class B), 17-A M.R.S. § 353(1)(B)(l) (2017); two counts of theft (Class C), 17-A M.R.S. § 353(1)(B)(4) (2017); and one count of aggravated criminal mischief (Class C), 17-A M.R.S. § 805(1)(A) (2017).

2.    He pleaded not guilty.

1

3.    The Court set a deadline of August 5, 2016 for the defense to disclose any expert witness reports to the State.

4.    Prior to trial, Mr. Davis moved to exclude the eye-witness identification testimony of Mr. Lloyd. A hearing was held and the motion was denied on August 18, 2016.

5.    A seven day jury trial started on December 6, 2016.

6.    On the first day of trial, the defense disclosed an expert witness report from Dr. Cutler to the State.

7.    On the third day of trial, the State objected to the defense presenting expert testimony from Dr. Cutler because the expert report was disclosed late. Defense argued: "And I understand it's late notice. Our concern is we don't want Mr. Davis to be prejudiced by not being able to present this witness."

8.    The Court denied the defense motion to introduce the expert witness testimony from Dr. Cutler.

9.    The jury deliberated from December 20th through December 22nd. On December 21st, the jury returned guilty verdicts on all counts apart from the two counts for murder. The court instructed the jury to continue their deliberations on the two murder counts.

10.    The next morning, the jury returned guilty verdicts on both murder counts.

11.    The Court sentenced Mr. Davis to life on the murder charges and lesser concurrent time on the other charges.

12.    A timely appeal to the Law Court was filed and decided on August 14, 2018 affirming the convictions.

13.    The appeal included the court's denial of presenting expert witness testimony. The Law Court ruled: "Davis also argues that the court erred by denying his request to present rebuttal expert witness testimony regarding the unreliability of eyewitness identifications and that the evidence was insufficient for the jury to find every element of each offense beyond a reasonable doubt. We find these arguments unpersuasive and do not address them further." *State v.Davis*, 2018 ME116 fn.1. The appeal was denied on August 14, 2018.

14.    On November 11, 2018, Mr. Davis filed a petition for post-conviction relief in the Aroostook County Court alleging ineffective assistance of counsel.

15.    On October 16, 2023, the above post-conviction petition was denied by the court.

16.   The above decision was appealed to the Maine Supreme Court, which denied the petition to appeal on April 3, 2024.

II.   **STATEMENT OF FACTS**

17.   In March of 2015, Mr. Davis hired Attorney Dan Lilley's office to represent him on the pending murder charges. Attorney Amber Tucker, who was an associate of Attorney Lilley's office, assisted Attorney Lilley in the representation.

18.   The defense was aware early on of the eye-witness evidence of William Llyod the State planned to present at trial indicating Mr. Llyod identified Matthew Davis as the person fleeing the Pratt-Kitchen home after the murders. The defense considered this important evidence in the State's case against Mr. Davis as Mr. Lloyd was the only eye-witness placing Mr. Davis at the scene of the murders.

19.   The defense attempted to exclude the eye-witness evidence through a motion in limine challenging the reliability of the identification. This motion was denied by the Court in August of 2016. The defense was aware at that time that the jury would

hear testimony from Mr. Lloyd that he identified Mr. Davis as the person fleeing the scene.

20.     Part of the defense strategy at trial was to raise doubts as to the reliability of Mr. Lloyd's identification of Mr. Davis. The defense hired Dr. Brian Cutler an expert in the field of eye-witnesses identification. Dr. Cutler was hired to help raise doubts as to the reliability of Mr. Lloyd's identification of Mr. Davis as the perpetrator.

21.     The defense first contacted Dr. Cutler on October 3, 2016 and a retainer payment was made to Dr. Cutler on November 7, 2016. (Petitioner Ex. 2). On November 29, 2016, Dr. Cutler provided the defense was a written report discussing factors relevant to the reliability of Mr. Lloyd's identification of Mr. Davis.

22.     The Court previously set a deadline for the disclosure of expert reports for August 5, 2016. The defense did not contacted Dr. Cutlet; or any eye-witness expert, prior to this deadline. No motions were filed to extend the deadline for the disclosure of expert reports by the defense, or to continue the trial.

23.     It was the defense's intention to call Dr. Cutler as a witness at trial. The defense intended to call Dr. Cutler because

they believed his testimony would help create doubt as to the reliability of the eye- witness identification. This was considered important testimony in the defense's strategy for creating doubt at to the reliability of Mr. Lloyd's identification.

24.    The defense believed Dr. Cutler's testimony would help the jury understand factors that could affect the reliability and accuracy of Mr. Lloyd's identification of Mr. Davis.

25.    The defense agrees it is best practice to hire an expert in time for the expert report to be disclosed before the deadline for expert reports set by the Court.

26.    The defense was aware that if Mr. Davis did not have funds to hire Dr. Cutler, the Maine Commission on Indigent Legal Services could be petitioned to cover the cost.

27.    Mr. Davis' wife, who was working with Attorney Lilley's office on the financial arrangements for the case, testified she made all payments requested by the office in a timely manner.

28.    Dr. Cutler did not recall any delay in getting work done in this matter because he was awaiting payment. Dr. Cutler's practice is not to delay work while waiting for payment. He would

have provided the final report to Attorney Lilley's office on or before any deadline provided by Attorney Lilley.

29.    Dr. Cutler is an expert in the field of eye-witness identification. At the time Dr. Cutler would have been called to testify in Mr. Davis' trial he was Professor and Interim Dean of the Faculty of Social Science and Humanities at the University of Ontario Institute of Technology (UOIT). Prior to joining the faculty at UOIT, he was Assistant, Associate, and Full Professor and Associate Dean at Florida International University and Professor and Chair of the Department of Psychology at the University of North Carolina at Charlotte. He had been conducting research on Forensic Psychology since 1984 and was past President of the American Psychology-Law Society, Division 41 of the American Psychological Association, and past Editor-in-Chief of the peer-reviewed journal Law and Human Behavior. He authored or edited the APA Handbook of ForensicPsychology, Conviction of the Innocent: Lessons from Psychological Research, Reform of Eyewitness Identification Procedures, Evaluating Eyewitness Identification, Expert Testimony on the Psychology of Eyewitness Identification, Encyclopedia of Psychology and Law. He authored

more than 90 book chapters and articles about forensic and social psychology in peer- reviewed psychology, forensic psychology, and law journals. He maintained an active research laboratory and am currently conducting research on eyewitness testimony. He qualified as an expert witness and have testified in state and federal courts throughout the country.

30.    Dr. Cutler reviewed the reports and materials relevant to Mr. Lloyd's eye-witness identification of Mr. Davis and was asked to provide a opinion concerning the factors that may have influenced the eyewitness descriptions and identification. "My opinion, which I hold to a reasonable degree of scientific certainty, is that certain factors associated with the conditions under which the Lloyds viewed the subject on the evening of September 23, 2013 and the nature of the eyewitness identification may have influenced the accuracy of the descriptions, identifications and the confidence of the eyewitnesses."

31.    Dr. Cutler would have provided the jury with an overview of the research on eye-witness identification and factors that can impact the accuracy of the identification.

32.    Dr. Cutler opined: "[I]n this case, I identified several factors that -- that could influence the Lloyds' ability to form a memory for the perpetrator, and those factors were exposure time, which refers to the specific amount of time that a witness has to view a perpetrator's face. It includes lighting conditions to the extent that I'm able to determine what they are, and degree of stress experienced by the witness at the time of the crime. So exposure time, lighting, and the stress are factors that are known to affect eyewitness identification. Eyewitness identifications are more at risk for error. That is a witness' ability to encode a perpetrator's characteristics are. Witnesses are less able, with shorter exposure time, darker lighting conditions, and under extreme stress, which is known to impair encoding abilities."

33.    Mr. Lloyd's short duration of viewing, under a high stress situation, at night with less than optimal lighting conditions could all affect his ability to accurately encode the person seen and affect the reliability and accuracy of his identification.

34.    Dr. Cutler opined: 'There are research studies on the effects of exposure time, and this research shows that under shorter exposure time, witnesses have more difficulty encoding the

9

perpetrator's characteristics, and witnesses are more likely to make mistaken identifications after shorter exposure time. With respect to lighting, under impoverished lighting conditions, witnesses are less able to encode basic characteristics of a perpetrator. Facial characteristics in particular are important for eyewitness identification. So witnesses make more mistakes under poor lighting conditions. And with respect to stress, extreme levels of stress are known to impair cognitive functioning in general. People do not process information as sufficiently or effectively under extreme stress, and eyewitnesses make more errors under extreme stress than under low or moderate levels of stress."

35.    Dr. Cutler's testimony would have helped the jury understand about how post-event information can influence the accuracy or an eye-witness identification. "Post-event information refers to information learned by an eyewitness after the details of a witnessed event have been encoded into memory. It is well-established in psychological research that post-event information can influence memory, and that post- event misleading: information can or produce errors in eve- witness recall."

36.   Dr. Cutler found "several sources or potential sources of post-event information in this case. For one, I -- there's the possibility that the witnesses, in this case, Mr. and Mrs. Lloyd, spoke with one another independent of the investigation. I don't know, but when witnesses speak to each other there's the potential or speak to other people, there's the potential for information to influence their memories. Mrs. Lloyd had, in one report, mentioned that she had heard that Mr. Davis was under arrest for -- for crimes unrelated to this one. I believe it was around the time of the investigation shortly after the crime. On the day after the crime when one of the detectives went to show a photo to Mr. Lloyd, he had -- Mr. Lloyd had explained that he had seen a news article on Facebook containing a photo of Mr. Davis and accompanying that photo was verbiage indicating that Mr. Davis was under investigation for this -- this crime. So those posts are examples of potential post-event information or post-event information that could potentially influence memory for the perpetrator."

37.   Dr. Cutler could have explained to the jury proper photo identification procedure and how the single photo of Mr. Davis that Mr. Lloyd saw in the media was suggestive and could have

influenced his identification. "In this case investigators prepared a photo array that included a photo of Mr. Davis. The photo array procedure, however, appeared to be preempted by the spontaneous identification of Mr. Davis by Mr. Lloyd based on a single photo of Davis presented in a Facebook post by the Bangor Daily News. Single-person or single-photo identification tests are inherently suggestive.... In terms described above, the absence of fillers (e.g., photos of non-suspects who could reasonably be mistaken for the subject) makes it impossible to rule out guessing or deduction as explanations for the eyewitness identification. Suggestiveness of the identification procedure was exacerbated by the nature of the photo and the context in which the photo was presented. The photo used was a booking photo. Above the photo appeared the following text: "Police are investigating whether Davis killed a couple, set fire to their house, used a stolen vehicle to get to a boat landing on Upper Mattawamkeag Lake in Island Falls, burned the vehicle and possibly tried to take a kayak before stealing another vehicle."

38.     Dr. Cutler's testimony would have included explaining to the jury that a witnesses confidence in the identification did not rule out error. "Considerable research bas been devoted to the

12

question of whether confident eyewitnesses are more likely to be accurate than less confident eyewitnesses, and some of this research challenges commonly held beliefs about confidence. That research shows that under certain circumstances, confidence is moderately associated with accuracy, as indicated by a meta-analysis of the studies examining the correlation between confidence and identification accuracy. Those circumstances include: (1) the witnessing conditions were favorable, (2) the identification procedure was not suggestive, and (3) confidence was assessed immediately after the identification procedure and before the witness learned any new information about his identification or the culpability of the suspect identified. Even when these conditions are met, confidence is not perfectly related to identification accuracy, meaning that there are many highly confident witnesses who are incorrect. When these conditions are not met, confidence becomes even less predictive of identification accuracy."

39.    It is Dr. Cutler's opinion that the impoverished viewing conditions, and the viewing of the suggestive media photo linking

Mr. Davis to the crimes "do reduce the relation between confidence and inaccuracy."

40.    Dr. Cutler could have offered testimony on Mr. Lloyd's prior familiarity with Mr. Davis and how Mr. Lloyd did not recognize the driver as Mr. Davis until he saw the media photo. "[W]hen you know people well, you're able to recognize them under impoverished circumstances, better more so than strangers, and in that instance, Mr. Lloyd did not identify Mr. Davis prior to seeing his photo. He didn't identify him as -- as the driver of the car. So another possibility is that he just didn't get a good enough look at the driver to -- to create a memory for the perpetrator and that his memory was driven by seeing the photo and to based upon his memory for the perpetrator."

41.    Dr. Cutler could explain the fallibility of eye-witness identification to the jury and how the single most common factor in wrongful convictions is mistaken eye-witness identification. About three quarter of the exonerations done by the Innocence Project involved mistaken eye-witness identification.

III.   **GROUNDS FO RELIEF UNDER SIXTH
       AMENDMENT OF UNITED STATES
       CONSTITUTION.**

42.   Defense counsel's representation fell below an objective standard of reasonableness by not timely hiring an eye-witness expert and failing to disclose the expert report in a timely manner so he could testify at trial.

43.   Defense counsel was aware from discovery Mr. Lloyd was the sole eye-witness placing Mr. Davis at the seen of the murders. The reliability and accuracy of Mr. Lloyd's identification of Mr. Davis would likely determine the outcome of the case. If the jury found Mr. Lloyd's identification reliable beyond a reasonable doubt Mr. Davis would be convicted of the murder as he was the only person identified as fleeing the home immediately after the crime. On the other hand, if the jury had a reasonable doubt as to accuracy of Mr. Lloyd's identification Mr. Davis should be acquitted of the murders.

44.   Defense counsel was unreasonable in not hiring an eye-witness expert before the expert witness deadline set by the Court. The defense knew the importance of challenging the reliability of Mr. Lloyd's identification early on. A motion in limine was litigated

15

to exclude the identification. Dr. Cutler could have assisted counsel in litigating the motion in limine by providing counsel, and possibly the Court through testimony, with the factors affecting the reliability of the identification, including the short observation time, high stress situation, poor lighting, and post-observation information.

45.   It was unreasonable for defense counsel to wait until the Court denied the motion in limine to exclude the identification before hiring Dr. Cutler. By time the Court decided the motion in limine on August 18, 2016, the deadline for expert disclosure had passed.

46.   The defense did not consult with Dr. Cutler until October 3, 2016. His report was received on the eve of trial and disclosed to the State the first day of trial. It was unreasonable to assume the Court would allow Dr. Cutler to testify at trial when the disclosure of the expert report was four months late and made at the start of trial.

47.   The defense could have hired Dr. Cutler sooner. There is no indication funds were not available to hire Dr. Cutler.     .

48.     There was no financial barrier to hiring an expert. The defense could have petitioned MCILS for funds to hire Dr. Cutler if needed.

49.     There can be no strategic reason to wait until October 3, 2016 to hire Dr. Cutler. Defense counsel agreed at the hearing that it is best practice to hire an expert in time for the report to be disclosed timely.

50.     Defense counsel was unreasonable in not moving the Court for an extension of the expert disclosure deadline after consulting with Dr. Cutler. The defense could had moved the Court for an extension of the deadline. If the Court declined to grant the extension, a motion to continue the trial could have made.

51     There is a reasonable probability that, but for counsel's error, the result of the proceeding would have been different.

52.     Defense counsels' error undermines the confidence in the outcome of the case. The case presented a difficult call for the jury-especially on the two murder charges. The jury deliberated for a day before indicating they were deadlocked on the murder charges. After another day of deliberation, a guilty verdict was reached on the murder charges. Based on the indication of a deadlock and the

amount of time it took to reach a verdict, the jury was not easily convinced the State had proven the murder charges beyond a reasonable doubt.

53.    The State's best evidence placing Mr. Davis at the scene of the murders was the eye-witness identification of Mr. Lloyd. Mr. Lloyd's testimony places Mr. Davis fleeing the scene of the murders immediately after the event. He is the only witness to identify Mr. Davis as being at the Pratt-Kitchen home at the time of the murders (or ever).

54.    Dr. Cutler's testimony would have offered the jury factors to consider in determining the accuracy of the identification. Dr. Cutler would provide the jury information that the viewing period, conditions under which the viewing occurred, and poor light all factor into the witnesses ability to accurately encode the subject viewed.

55.    The jury could have considered the above factors in determining whether Mr. Lloyd's short viewing of the subject, in a high stress situation, at night allowed him to accurately encode the subject viewed.

56.    Dr. Cutler's testimony would have informed the jury how post-event information can affect the reliability of an identification. The jury could have considered how Mr. Lloyd only identified Mr. Davis as the person he saw after seeing a media post with Mr. Davis' mugshot indicating he was arrested for the murders. The jury could weigh the accuracy of his identification in light of this highly suggestive post-event information.

57.    Dr. Cutler's testimony could have educated the jury how people are more likely to recognize someone they have familiarity with under impoverished viewing conditions. This would allow the jury to consider that Mr. Lloyd did not initially recognize Mr. Davis' as the driver, which could mean Mr. Lloyd never had enough time to encode the person seen and only identified him as Mr. Davis after seeing the suggestive media photograph linking Mr. Davis' to the crimes.

58.    Dr. Cutler could have educated the jury on weak correlation between confidence in the identification and accuracy, and the prevalence of false identification in the DNA exoneration cases.

59.    All of the above information could have raised a reasonable doubt in one more of the juror's minds as to the accuracy of the identification. The jury not hearing Dr. Cutler's testimony undermines the confidence in the outcome. The jury already found this to be a close case and hearing Dr. Cutler's testimony may have resulted in a different verdict, or a deadlock on the murder charges.

IV.    **RELIEF REQUESTED**

60.    It is respectfully requested the Court find Mr. Davis was deprived of his right to effective assistance of counsel and vacate the conviction and sentence.

Dated: May 31, 2024

Respectfully submitted,

88 Hammond Street, Ste 301
Bangor, Maine 04401
(207) 941-8443
hunter@bangorlegal.com

## CERTIFICATE OF SERVICE

I hereby certify I mailed a copy of the above petition on May 31, 2024 to: Attorney General, 6 State House Station, Augusta, Maine 04333.

Hunter J Tzovarras