UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

MATTHEW DAVIS,                          )
                                        )
            Petitioner                  )
                                        )
    v.                                  )        1:24-cv-00205-SDN
                                        )
MAINE STATE PRISON,                     )
                                        )
            Respondent                  )

**RECOMMENDED DECISION ON 28 U.S.C. § 2254 PETITION**

Petitioner, pursuant to 28 U.S.C. § 2254, seeks relief from the state court

convictions and sentences for murder, arson, theft, and aggravated criminal mischief.

(Petition, ECF No. 1.)  Petitioner alleges that his attorney provided ineffective assistance

by failing to introduce expert testimony regarding the reliability of eyewitness

identifications.  The State asks the Court to dismiss the petition.  (Response, ECF No. 4.)

After a review of the section 2254 petition, the State's request for dismissal, and the

record, I recommend the Court grant the State's request and dismiss the petition.

**FACTUAL BACKGROUND AND PROCEDURAL HISTORY**[1]

**A.      The Crimes and the Arrest**

After receiving a 911 call from neighbors, police and firefighters arrived at the

Oakfield home of Heidi Pratt and Michael Kitchen shortly before 5:00 a.m. on September

---

[1] The facts recounted below are drawn primarily from state court summaries, s*ee* 28 U.S.C. § 2254(e)(1)
("a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant
shall have the burden of rebutting the presumption of correctness by clear and convincing evidence");
*Hensley v. Roden*, 755 F.3d 724, 727 (1st Cir. 2014) (recounting the facts as "derived from the [state court]

23, 2013.  The house was on fire, a white pickup truck was crashed against a corner of the house and was burning, and an overhead door was damaged and on the ground in front of the detached garage.  After extinguishing most of the flames, firefighters entered the house and found the bodies of Mr. Kitchen and Ms. Pratt.  There was an AR-15 style rifle on top of Mr. Kitchen, and there were bullet holes observable in the body.

Shannon Lloyd, the neighbor who called 911, told police that she and her husband, William, heard multiple gunshots and then realized the house next to their house was on fire. William Lloyd ran toward the house first and Shannon followed. As she was approaching the burning house, Ms. Lloyd saw a tall, slim man drive a truck out through the garage door.  After the truck backed up and faced toward her, she fled and called 911. Mr. Lloyd told police that as the truck backed away from the garage, he stepped in front of the truck to see through the windshield and saw a man whom he did not recognize with a light complexion, a light shirt, a close haircut, and big eyes.

The white truck that was crashed against the victims' house was registered to a nearby business.  At the location of the business, employees and then authorities found a dark colored pickup truck[2] backed into another building, which was also on fire.  Police found shells and magazines for an AR-15 style firearm, and a safe broken into two pieces. The dark colored truck was registered to Petitioner and his wife.  Police in the area were notified to look for Petitioner.

---

decision"), as well as the transcripts, dockets, and other filings in the state court record to the extent the filings contained important undisputed facts.

[2] The truck was described as a pickup truck body mounted on a wrecker flatbed.

Authorities also received a 911 call from an individual who had discovered a truck on fire at a camp on Richardson Road in Island Falls, which is on a lake and several miles from the victims' house. After firefighters suppressed the fire in the truck and the garage it was parked against, police identified the vehicle as the truck belonging to Mr. Kitchen's family, which truck had been driven out of the garage at the victims' house. Police also found .223 caliber ammunition in the vehicle and several firearms, including a .45 caliber revolver. Later that morning, when the owner of the camp arrived, he noticed that one of his kayaks was missing. It was later discovered that another kayak had been moved from the garage to the camp owner's dock on the lake. The kayak was tipped on its side and partially filled with water.

On the same morning, the owners of a nearby residence on Beaver Dam Point Road found a kayak on their lawn and, to inquire about the kayak, contacted a neighbor and then police. The residence on Beaver Dam Point Road was located directly across the lake from the Richardson Road camp where the pickup truck belonging to Mr. Kitchen's family was found. When police searched around the Beaver Dam Point Road residence, they found a paddle.

As officers were preparing to use a canine to track for human scent around Beaver Dam Point Road, they observed a black Mazda driving up the road. They signaled for the vehicle to stop and saw that the driver was a man with short hair who was wearing a black shirt. Officers asked for identification, and, after examining the driver's license, recognized that the driver was Petitioner, the suspect for whom they were searching. When police asked how he was doing, Petitioner responded that he was better now, and when

3

asked from where he was traveling, Petitioner responded that he was coming from hell. When asked again, Petitioner said he was coming from a friend's camp, but he could not provide a name of the friend. The officers asked Petitioner to exit the vehicle and they placed him under arrest. Subsequently, the police canine tracked human scent from the kayak to other camps on Beaver Dam Point Road, which camps showed signs of forced entry. The police canine also located in the woods near the camps a wallet containing Mr. Kitchen's driver's license and credit cards.

The next morning, September 24, 2013, a police officer returned to the Lloyd residence for another interview and to conduct a photo lineup identification. According to the officer, before he showed Mr. Lloyd a lineup of photographs, Mr. Lloyd said that he had seen a news article containing a photograph of Petitioner. Instead of showing Mr. Lloyd the photographs as planned, the officer took a statement from Mr. Lloyd. Mr. Lloyd said that he was sure that the man in the booking photograph was the same man he saw driving the pickup truck at the crime scene.

**B.    Trial Court Proceedings**

In November 2013, Petitioner was indicted on two counts of murder in violation of 17-A M.R.S. §§ 201(1)(A) and 1158-A(1)(A), four counts of arson in violation of 17-A M.R.S. § 802(1)(A), three counts of theft by unauthorized taking in violation of 17-A M.R.S. §§ 353(1)(B)(1) and (4); and one count of aggravated criminal mischief in violation of 17-A M.R.S. § 805(1)(A). In August 2014, Petitioner filed a motion in limine to exclude the eyewitness identification evidence from Mr. Lloyd. After holding testimonial hearings on the issue, the Superior Court denied the motion.

At trial in December 2016, firefighters and police testified about their observations and the investigation. Shannon and William Lloyd testified largely consistent with their statements to police.[3] Another witness confirmed that Mr. Lloyd and Petitioner were familiar with each other before the crime occurred because they attended a motorcycle class together. Mr. Lloyd said he did not originally recognize Petitioner because when he had previously interacted with Petitioner, Petitioner was not as thin and had longer hair.

Experts testified that the fires were intentionally started with an ignitable substance, such as gasoline. Other experts testified that the bullets recovered from the victims came from two firearms, a .45 caliber revolver, and a .223 caliber rifle. An expert testified that the .223 caliber bullets matched the AR-15 style rifle found at the crime scene, which rifle belonged to Petitioner. The broken safe at the nearby business where Petitioner's pickup truck was found also belonged to Petitioner and his wife.

The State introduced into evidence a pair of gloves found in the victims' house, and a DNA expert testified that Petitioner was the sole source of DNA found inside one of the gloves. Petitioner's DNA was also on a Coke bottle found at the Richardson Road camp, where Mr. Kitchen's truck was found burning. Petitioner was excluded as the source of DNA on a hammer found on Mr. Kitchen's truck tailgate.

The owner of a camp near the Beaver Dam Point Road residence testified that she had been at her camp a few days before the murders and when she returned, she found

---

[3] Defense counsel highlighted the fact that Ms. Lloyd recalled telling police certain details, such as seeing the driver in a maroon shirt and having big eyes, which details the police officer did not note or recall her saying at that time. Mr. Lloyd in different interviews seemed to use the word "light" shirt to mean light colored, and at other times to mean light weight, as in a t-shirt.

signs of forced entry and disturbed possessions.  Police found blood stains on the packaging

of tea lights in the refrigerator.  The DNA in the blood matched Petitioner's DNA.

The Mazda belonged to the owner of another property on Beaver Dam Point Road

on which property at least two camps were located.  The brother of the man who owned

the Mazda and the real property testified at trial.  The owner's brother stayed at one of the

camps and was responsible for monitoring his brother's property while his brother was out

of state.  According to the owner's brother, before the night of the murders, the Mazda was

at his brother's place and the keys were on the kitchen table.  Police found a box of Sunkist

orange soda cans on the table in the kitchen, and police found Petitioner's DNA on a

Sunkist orange soda can in the Mazda after Petitioner was arrested.

A forensic expert testified that, in terms of size, tread design, wear characteristics

and damage points, there was a strong agreement between the impressions collected from

foam insulation boards found at the nearby business location, the boot prints found at one

of the camps, and the sole of the boots Petitioner was wearing when he was arrested.

Defense counsel argued that the chain of custody regarding the boots was unreliable

because the officer who first logged the boots as evidence listed them in his report as

"Wolverine" boots whereas subsequent individuals described them as "Carolina" brand.

The officer who wrote "Wolverine" testified that he did not examine the boots to identify

the brand; he wrote "Wolverine" boots because they looked like a pair of Wolverine brand

boots that he owned.

Petitioner's wife testified at trial that Petitioner was at home when she fell asleep

the evening before the murders, but he was not at their home when she woke up on the

morning of the murders.  According to his wife, Petitioner wore boots of a different brand and two sizes larger than the boots the State presented.  The defense team also demonstrated that the shoes Petitioner wore at trial were two sizes larger than the boots.

Defense counsel had engaged an expert witness to testify about the difficulties of eyewitness identification evidence, but counsel did not disclose the expert to the State until just before trial and did not disclose a copy of the expert's report until after the trial had commenced.  The Superior Court denied Petitioner's request to call the expert witness.

On December 21, 2016, the jury found Petitioner guilty of the arson, theft, and mischief charges.  On December 22, 2016, the jury found Petitioner guilty of the murder charges.  In February 2017, the Superior Court sentenced Petitioner to life in prison.

## C.     Appeal and Postconviction Proceedings

Petitioner filed an appeal, arguing that (1) the Superior Court erred in excluding the expert witness, (2) the use Mr. Lloyd's identification testimony violated Petitioner's right to due process because the state acted improperly regarding the booking photograph, and (3) even if the state did not act improperly, Mr. Lloyd's identification testimony was unreliable and should have been excluded; in August 2018, the Law Court affirmed.  *State v. Davis*, 2018 ME 116, ¶ 1, 191 A.3d 1147, 1149.

In November 2018, Petitioner filed a state petition for postconviction review.  Petitioner argued that trial counsel provided ineffective assistance by failing to arrange for the introduction into evidence of the expert witness testimony.  At a hearing in September 2022, the expert witness testified regarding the opinions he would have offered if he had been called at trial.  In October 2023, the Superior Court denied the petition.  Petitioner

sought discretionary review; in April 2024, the Law Court denied the request for a certificate of probable cause to appeal the Superior Court's decision.

Petitioner then filed the § 2254 petition.

## DISCUSSION

### A.    Legal Standards

Pursuant to 28 U.S.C. § 2254(a), a person in custody pursuant to the judgment of a state court may apply to a federal district court for a writ of habeas corpus "only on the ground that he [or she] is in custody in violation of the Constitution or laws or treaties of the United States."

Absent circumstances not relevant to Petitioner's case, a petitioner is required to exhaust available state court remedies before he seeks federal habeas review. 28 U.S.C. § 2254(b), (c).[4] "Before seeking a federal writ of habeas corpus, a state prisoner must

---

[4] Title 28 U.S.C. § 2254(b) and (c) address exhaustion and state:

**(b) (1)** An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that—

    **(A)** the applicant has exhausted the remedies available in the courts of the State; or

    **(B) (i)** there is an absence of available State corrective process; or

    **(ii)** circumstances exist that render such process ineffective to protect the rights of the applicant.

**(2)** An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.

**(3)** A State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement.

**(c)** An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

exhaust available state remedies, 28 U.S.C. § 2254(b)(1), thereby giving the State the 'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." *Baldwin v. Reese,* 541 U.S. 27, 29 (2004) (quoting *Duncan v. Henry,* 513 U.S. 364, 365 (1995) (per curiam)) (quotation marks omitted).   In *Baldwin,* the Court noted that "[t]o provide the State with the necessary 'opportunity,' the prisoner must 'fairly present' his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim." *Id.* (quoting *Duncan,* 513 U.S. at 365–66).

To exhaust a claim fully in state court in Maine, a petitioner must request discretionary review by the Law Court.  *See* 15 M.R.S. § 2131.  The Supreme Court has held that a procedural default bars federal review absent cause for the default and prejudice to the petitioner:

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 750 (1991).[5]  A "fundamental miscarriage of justice" has only been recognized in cases of "actual innocence," meaning that the petitioner must demonstrate that "it is more likely than not that no reasonable juror would have found

---

[5] Procedural default is a judicial doctrine "related to the statutory requirement that a habeas petitioner must exhaust any available state-court remedies before bringing a federal petition." *Lovins v. Parker,* 712 F.3d 283, 294 (6th Cir. 2013) (citing 28 U.S.C. § 2254(b), (c)).

petitioner guilty beyond a reasonable doubt." *Gunter v. Maloney*, 291 F.3d 74, 83 (1st Cir. 2002) (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

Because the constitutional right to counsel does not extend beyond a direct appeal to cover collateral attacks on a conviction, *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987), ineffective assistance in a state postconviction proceeding generally cannot establish cause to set aside a procedural default. *Coleman*, 501 U.S. at 752–55. In *Martinez v. Ryan*, 566 U.S. 1 (2012), the Supreme Court recognized a "narrow exception" to the rule, based on equity, not constitutional law: "Inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." 566 U.S. at 9, 16. However, when the procedural default relates to post-conviction counsel's actions at the discretionary-review stage rather than at the initial-review stage of the collateral proceedings, habeas relief is not available:

> The holding in this case does not concern attorney errors in other kinds of proceedings, including appeals from initial-review collateral proceedings, second or successive collateral proceedings, and petitions for discretionary review in a State's appellate courts. It does not extend to attorney errors in any proceeding beyond the first occasion the State allows a prisoner to raise a claim of ineffective assistance at trial . . . .

*Martinez*, 566 U.S. at 16 (citations omitted).

As to federal habeas claims that were adjudicated on the merits in state court, the federal court may not grant relief unless (1) the state court decision was contrary to, or an unreasonable application of, federal law, as determined by the Supreme Court, pursuant to

28 U.S.C. § 2254(d)(1); or (2) the decision was based on an unreasonable determination of the facts, pursuant to section 2254(d)(2).[6]

As to review of a state court decision under section 2254(d)(1), "[i]t is settled that a federal habeas court may overturn a state court's application of federal law only if it is so erroneous that 'there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents.'" *Nevada v. Jackson,* 569 U.S. 505, 508-09 (2013) (per curiam) (quoting *Harrington v. Richter,* 562 U.S. 86, 102 (2011)). "A state court must be granted a deference and latitude that are not in operation when the case involves review under the [*Strickland v. Washington*, 466 U.S. 668 (1984)] standard itself." *Harrington*, 562 U.S. at 101. Claims of ineffective assistance of counsel are thus subject to a "'doubly deferential'" standard of review, in deference to both the state court and defense counsel. *Woods v. Etherton,* 578 U.S. 113, 117 (2016) (per curiam) (quoting *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011)). State court determinations of fact "shall be presumed to be correct," and "[t]he applicant shall have the burden of

---

[6] Title 28 U.S.C. § 2254(d) provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim−

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).[7]

In *Strickland*, the Supreme Court set forth the relevant Sixth Amendment standard by which claims of ineffective assistance based on counsel's errors are evaluated on the merits; *Strickland* requires a petitioner to demonstrate that "counsel's representation fell below an objective standard of reasonableness," and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 688, 694. A court need not "address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697. A court presumes "that counsel has 'rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" *Companonio v. O'Brien*, 672 F.3d 101, 110 (1st Cir. 2012) (quoting *Strickland*, 466 U.S. at 690).

---

[7] Because the Law Court's decisions are the final state court adjudications on the merits of each claim, the decisions under review in this case are the Law Court's orders affirming the decisions of the trial court. *See Greene v. Fisher*, 565 U.S. 34, 40 (2011) (noting that the last state-court adjudication on the merits of the petitioner's constitutional claim occurred on direct appeal to the state's supreme court); *Clements v. Clark*, 592 F.3d 45, 52 (1st Cir. 2010) ("A matter is 'adjudicated on the merits' if there is a 'decision finally resolving the parties' claims, with res judicata effect, that is based on the substance of the claim advanced, rather than on a procedural, or other, ground.'") (quoting *Teti v. Bender*, 507 F.3d 50, 56-57 (1st Cir. 2007)).

However, because the Law Court's postconviction order did not explain the Court's reasoning for denying a certificate of probable cause, the federal court may consider the trial court's decision for those claims:

> We hold that the federal court should "look through" the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning.

*Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018) (noting the state may rebut the presumption).

A court considers "the totality of the evidence," and "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Strickland*, 466 U.S. at 695-96. "[T]he ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged." *Id.* at 696.

## B.    Ineffective Assistance Regarding Expert Testimony

Petitioner argues that trial counsel provided ineffective assistance by failing to retain timely and disclose the expert witness regarding eyewitness identifications or move for an extension of time so that the expert could testify in connection with the motion in limine and at trial. According to the state postconviction court:

> The essence of [the expert's] testimony was that the accuracy of an eye witness' testimony can be adversely affected by several different factors. These include how long a witness has to make his observations, i.e. how long was the exposure opportunity for seeing a person's face? They also include consideration of the prevailing lighting conditions and whether they were favorable or unfavorable to seeing what was there to be seen. [The expert] testified that there could be other factors associated with the witness' opportunity to see, "encode" (i.e. form a reliable memory) and recount such as being in an extremely stressful environment as events unfold. [The expert] pointed out that each of these factors could potentially adversely affect a person's ability to form an accurate and reliable memory of what the witness purports to have seen. [The expert] also addressed the possibility that a witness might be exposed to post-event information that could also influence the accuracy of the witness' identification.
>
> In describing his research regarding eyewitness identification, [the expert] was careful to point out, "What I don't do is give an opinion about the— accuracy of any eyewitness identification." At most, what [the expert] could have testified to at trial was, as he wrote in his report, "My opinion, which I hold to a reasonable degree of scientific certainty, is that certain factors associated with the conditions under which the Lloyds viewed the subject on the evening of September 23, 2013 and the nature of the eyewitness

> identification *may have influenced the accuracy of the description, identifications and the confidence of the eyewitnesses*.

*Davis v. State*, No. CR-18-20695, 2023 WL 9743784, at *5 (Me. Super. Ct. Oct. 16, 2023) (footnotes and citations omitted) (emphasis supplied by the Superior Court).  The expert maintained that eyewitness identification is the greatest cause of wrongful convictions nationwide, playing a role in seventy percent of convictions that later resulted in DNA-based exonerations.

In some circumstances, an attorney's decision not to introduce expert testimony on eyewitness identifications can constitute deficient performance.  *See, e.g.*, *United States v. Nolan*, 956 F.3d 71, 81 (2d Cir. 2020).  The postconviction court, however, found it unnecessary to determine whether there was deficient performance because Petitioner did not establish the requisite prejudice from the absence of the expert testimony.  The state court reasoned that because the jury instructions were similar to the expert's testimony, there was no likelihood that the outcome of the trial was altered by the exclusion of the witness.  Regarding eyewitness credibility, the jury was instructed:

> You can consider how good an opportunity the witness had to make the observations that he or she says were made.  As you are evaluating the evidence and perhaps considering a witness' opportunity to observe the things that the witness has described in his or her testimony you should understand that we have come to recognize that testimony by a witness as to identity must be received with caution and scrutinized with care.  The State's burden of proof extends to every element of each crime charged, including the burden of proving beyond a reasonable doubt the identity of an alleged perpetrator of an offense.  Accordingly, as you are considering the accuracy of any eye witness identification testimony, you may consider the opportunity that the witness had to make that identification, taking into account such things as the length of time spent in making the observation, the particular circumstances of the opportunity, including the distance between the witness and the person being identified, the lighting conditions

14

at the time and the degree of stress the witness may have been experiencing at the time of making his or her observations. You are also free to take into account whether the witness was influenced by any suggestive events or by the recollections of other witnesses or by identifications made by other witnesses. You may wish to take into account any lapse of time between the event and the identification. You may want to consider how much weight to assign to the degree of confidence a witness may have expressed in his or her identification recognizing that even very confident people can be wrong. Ultimately, I would suggest that you want to consider the totality of all of the circumstances that surround eyewitness identification testimony.

*Id.* at *6. The state court also concluded that Petitioner was not prejudiced by counsel's actions because there was sufficient other evidence establishing his guilt.

The state court's reasoning is sound. First, the absence of the expert testimony does not undermine confidence in the outcome because the cautionary jury instructions reduced to some degree the need for and the potential significance of the expert testimony. More importantly, the record contains overwhelming evidence of Petitioner's guilt aside from the eyewitness evidence. Many of the notable characteristics of the several crime scenes (e.g. ammunition, handling of the discarded vehicles, setting fires, timing) tied each of the crime scenes closely to one another, and the evidence linked Petitioner to each of the crime scenes. As the state court noted: Petitioner's rifle was used to kill one of the victims and was found on the body of the victim; a glove with Petitioner's DNA was found near one of victims; Petitioner's wrecker truck was found at a nearby business where another vehicle had been stolen and then driven into the side of the victims' home; prints matching Petitioner's boots were found at the local business; and Petitioner's revolver and a soda bottle containing his DNA were found in the truck that was taken from the victims' garage.

Furthermore, Petitioner's DNA and prints matching his boots were found at other crime scenes very near the location where one of victims' wallet was discovered.

Given the compelling evidence of Petitioner's guilt, even if a jury were to disregard the identification testimony, there is no reasonable likelihood of a different result. Because Petitioner failed to establish a reasonable probability that counsel's decisions regarding the expert testimony impacted the outcome of his case, the state court's decision was not contrary to or an unreasonable application of *Strickland* or its progeny.

### CONCLUSION

Based on the foregoing analysis, an evidentiary hearing is not warranted under Rule 8 of the Rules Governing Section 2254 Cases. I recommend the Court dismiss Petitioner's petition for habeas relief under 28 U.S.C. § 2254, and that the Court deny a certificate of appealability pursuant to Rule 11 of the Rules Governing Section 2254 Cases because there is no substantial showing of the denial of a constitutional right within the meaning of 28 U.S.C. § 2253(c)(2).

### **<u>NOTICE</u>**

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within fourteen

(14) days of being served with a copy thereof.  A responsive memorandum and shall be filed within fourteen (14) days after the filing of the objection.

       Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.

/s/ John C. Nivison
U.S. Magistrate Judge

Dated this 18th day of December, 2024.